## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **NORTHWESTERN HUMAN SERVICES, INC.:** : | |
| 620 Germantown Pike : | |
| Lafayette Hill, PA 19444 : | |
| **and** : | |
| **NORTHWESTERN INTRASYSTEMS, INC.** : | |
| 620 Germantown Pike : | |
| Lafayette Hill, PA 19444 : | |
| **and** : | |
| **NORTHWESTERN INTRASYSTEMS, INC.** : | |
| **TRUST DATED APRIL 1, 1994** : | |
| 620 Germantown Pike : | |
| Lafayette Hill, PA 19444 : | |
| : | **CIVIL ACTION NO. 03-157** |
| **Plaintiffs,** : | |
| : | |
| **v.** : | |
| : | **JURY TRIAL DEMANDED** |
| **ROBERT C. PANACCIO** : | |
| 40 Dunminning Road : | |
| Newtown Square, PA 19073 : | |
| **and** : | |
| **MARTA PANACCIO** : | |
| 40 Dunminning Road : | |
| Newtown Square, PA 19073 : | |
| **and** : | |
| **THOMAS X. FLAHERTY** : | |
| 1 Hidden Lane : | |
| Phoenixville, PA 19460 : | |
| **and** : | |
| **BARRY N. BOWERS** : | |
| 347 West Main Street : | |
| Trappe, PA 19426 : | |
| **and** : | |
| **JOHN DOES, 1-6** : | |
| {Addresses Unknown} : | |
| **and** : | |
| **JANE DOES, 1-6** : | |
| {Addresses Unknown} : | |
| **and** : | |
| **DOE CORPORATIONS, 1-6** : | |
| {Addresses Unknown} : | |

|  | : |
|---|---|
| **Defendants.** | : |
|  | : |
| _____ | : |

## SECOND AMENDED CIVIL ACTION COMPLAINT

Plaintiff, by and through undersigned counsel,  Bochetto & Lentz, P.C., comes now and complains as follows:

## I.  INTRODUCTION

1.      This is a civil action brought pursuant to various federal statutes and the common law against the former President and Chief Executive Officer of NHS[1], Robert C. Panaccio ("Panaccio"), former NHS Board member Thomas X. Flaherty ("Flaherty") and various other defendants, all of whom conspired to one degree or another to cause NHS to engage in conduct designed to enrich themselves at Plaintiffs' expense.  In sum and substance,  they stripped the assets of NHS by various acts of fraud, breaches of fiduciary duty, and self-dealing.

2.      The Defendants looted NHS in various ways.  For one, Panaccio purchased for himself, with the aid of former insurance and business consultant to NHS, John L. McKeever, III ("McKeever") and his brokerage firm, McKeever, Burke & Grant ("MBG"), various insurance policies and annuities, providing himself with millions of dollars worth of benefits to which he was not entitled and enriching himself at NHS' expense.  He also provided himself excessive "salaries," perquisites, expense accounts, other payments and kick-backs.

3.      In yet another scheme, Panaccio created a for-profit automobile leasing company, Amica Leasing ("Amica") to overcharge NHS hundreds of thousands of dollars

_____

[1]  "NHS" stands for Northwestern Human Services, Inc. and the Plaintiffs herein are sometimes referred to collectively as NHS.

annually in connection with a fleet of 400 vehicles. Although Amica was owned by NHS, Panaccio used the Amica revenues as a personal slush fund, gave cars to friends and family members at NHS' expense, and put family members who did no work on Amica's payroll. Panaccio also orchestrated a series of illegal payments to third-parties who, in turn, kicked-back funds to Panaccio under the guise of "consulting" fees.

4.      Panaccio also established an arrangement similar to the Amica fraud through a separate labor company, United Staffing, which was to provide temporary labor to NHS.

5.      Further, and perhaps most blatantly of all, Panaccio and Flaherty fraudulently cheated NHS out of millions of dollars for a purported investment in a baseball stadium and related real estate through a series of misrepresentations to the NHS Board of Trustees and fraudulent transactions.

6.      This action is brought now by the newly installed NHS Board of Trustees and management because NHS was, until recently, under the fraudulent control of Defendants, because many of the records were either destroyed or confiscated by Defendants, and because the former management used NHS for its own purposes and not exclusively for the purposes for which NHS was formed.  Because such former management exercised complete dominion and control over NHS, including the former Board of Trustees, through a series of frauds, misrepresentations, and punishment/reward systems, NHS was incapable of bringing this action until now.  Also, documents and facts necessary to bring the causes of action alleged herein were not, despite the exercise of reasonable diligence, available to Plaintiffs until well after Panaccio's departure.

7.      Significantly, this action also seeks to implement the agreement between the United States Department of Justice and NHS that obligates NHS, for the Government's benefit, to recover from defendants restitution and to contribute towards the payment of damages suffered by NHS and the Federal Government by virtue of defendants' fraudulent conduct.

8.      The damages caused to Plaintiffs by Defendants include, but are not limited to, a $780,000 fine and a related $7 million dollar civil settlement imposed upon NHS by the United States Department of Justice; hundreds of thousands of dollars incurred by NHS in attorney's fees arising from the Department of Justice investigation;  millions of dollars funneled from NHS to defendants in the form of unearned salaries, consulting fees, commissions, compensation plans, insurance and annuity products,  automobiles, credit cards, expense accounts, and memberships in social and private organizations; millions of dollars lost to NHS by virtue of Defendants' use of NHS funds for the fraudulent Amica, United Staffing, and Stadium transactions and more than a million dollars in administrative and legal costs in undoing the wrongs committed by Defendants and in pursuing this action.

## II.  **THE PARTIES**

9.      Plaintiff Northwestern Human Services, Inc. ("NHS") is a Pennsylvania non-profit corporation, with a principal place of business located at 620 Germantown Pike, Lafayette Hill, Pennsylvania 19444.  NHS serves as the parent organization of its non-profit and for-profit affiliated organizations.

10.     Plaintiff Northwestern Intrasystems, Inc. ("NI") is a Pennsylvania non-profit corporation, with a principal place of business located at 620 Germantown Pike, Lafayette Hill, Pennsylvania 19444, and is a wholly owned affiliate of NHS.

11.     Plaintiff Northwestern Intrasystems, Inc. Trust dated April 1, 1994 ("NI Trust") is a trust created in Pennsylvania with a principal place of business located at 620 Germantown Pike, Lafayette Hill, Pennsylvania 19444.  NI Trust was created by NI, which has the power to appoint the Trustees.

12.     Each of the Plaintiffs herein are sometimes collectively referred to as "NHS" or as the "Plaintiffs."

13.     Defendant Panaccio is an adult individual residing at 40 Dunminning Road, Newtown Square, Pennsylvania 19073.

14.     Defendant Marta Panaccio ("Marta") is the wife of defendant Panaccio, who resides with him and who received some or most of the benefits from the acts complained of herein.

15.     Defendant Flaherty is an adult individual residing at 1 Hidden Lane, Phoenixville, Pennsylvania 19460 who, at various times, served on one or more Board of Directors or Trustees of various NHS entities.

16.     Defendant Barry N. Bowers is an adult individual having his principal place of business at 347 West Main Street, Trappe, PA 19426.

17.     John Does 1-6 are individuals whose identities are as yet unknown but who participated in or received the fruits of the various wrongs complained of herein.

18.     Jane Does 1-6 are individuals whose identities are as yet unknown but who participated in or received the fruits of the various wrongs complained of herein.

19.     Doe Corporations 1-6 are corporations whose identities are as yet unknown but which participated in or received the fruits of the various wrongs complained of herein.

20.     John Does 1-6, Jane Does 1-6,  and the Doe Corporations are sometimes collectively referred to herein as the Doe Defendants.

21.     The Doe Defendants are believed to have been involved in the frauds and breaches of fiduciary duties complained of herein, but because of a marked absence of records which would, under ordinary circumstances, have been retained, evidence of a *prima facie* case that can be identified by the new management of NHS does not exist as to them.  As to each of the Doe Defendants, Plaintiffs believe that upon execution of discovery, sufficient evidence will be developed with which to name specific individuals and entities as Doe Defendants relating to transactions involving, among other things, fraudulent financing schemes and leasing schemes, fraudulent or abusive services and professional service arrangements, further breaches of fiduciary duties and conflicts, and further causes of action for restitution and damages.

22.     Though not named herein by specific identification, each of the Doe Defendants reasonably anticipated by Plaintiffs herein to be subsequently identified are being served with a copy of this Complaint.

### III.  JURISDICTION AND VENUE

23.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because all of the defendants regularly conduct business in this district and because federal questions pursuant to the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. § 1961-68 et. seq.,

and the Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78(j) are at issue. This Court thereby also has jurisdiction over all ancillary claims pled herein.

24.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C.§ 1331(b) because this is where the acts complained of occurred, where each of the Defendants regularly conduct business, and where each of the Plaintiffs is headquartered.

## IV. FACTS COMMON TO ALL COUNTS

### A.     Background of NHS

25.     NHS was formed on May 4, 1981, under its then name, the "Northwestern Corporation."

26.     On July 11, 1996,  NHS' name was formally changed to "Northwestern Human Services, Inc."

27.     NHS is the parent and umbrella organization to various "Northwestern" entities, including NI, and has as its principal mission providing community-based mental health and mental retardation services to indigent individuals.  In 1996, NHS began providing services in states other than Pennsylvania.  Presently, NHS operates program sites throughout Pennsylvania, Virginia, Washington, D.C., and New Jersey and serves an excess of 50,000 children and adults each year.

28.     Defendant Panaccio was hired in the early 1980's as President and CEO of NHS and remained in that capacity until his resignation in June of 2000.

29.     According to NHS' Articles of Incorporation (attached hereto as Exhibit "A"), no part of its earnings shall inure to the benefit of any individual, member, director, officer or trustee except for reasonable compensation for services rendered.

30.     As is typical with non-profit, social service organizations, NHS operated with virtually no excess earnings, was designed to spend most of its revenue for the benefit of its individual patients, and had a policy of hiring and contracting for services on as economical, cost-effective basis (far below prices paid in the for-profit sector) as possible.

31.     NHS was at all times hard pressed for operating capital and funds for expansion, was never able to develop any substantial retained or excess earnings, and was never able to establish any endowments of a substantial nature.  NHS frequently had trouble making payroll, and oftentimes had to defer needed purchases due to a lack of funds.  NHS was regularly behind in its payables.

**B.      NHS' Source of Funds**

32.     Historically, a substantial amount of NHS services were community based services for the treatment of  mentally and socially handicapped individuals, including partial hospitalization services.

33.     In return, NHS rendered billings to county, state, and federal funding sources, such as Medicare and Medicaid, and in that regard, NHS had to comply with a detailed set of regulations concerning the rendering of its services, the appropriate charges permissible, and the criteria for individuals that qualify as patients.

34.     To be entitled to payment under the Medicare program, the partial hospitalization services must be: pursuant to a specific treatment plan; under the direct personal supervision of the treating physician; limited to a maximum of eight patients for group therapy sessions; and limited to specific time increments.  Further, the treatment plans must be

reasonable and necessary and reasonably expected to improve or stabilize the patient's condition and functional level in order to prevent relapse or hospitalization.

35.     To be entitled to payment under the Medicaid program, the partial hospitalization services must be: licensed by the Department of Public Welfare; pursuant to a specific medical treatment plan; staffed with one appropriate full-time clinical staff member for every six adults, one appropriate full-time clinical member for every five children; and staffed with a minimum of two hours of assigned psychiatric time per week for every five patients.

## C.     Criminal Conduct

36.     Panaccio and others under his direction caused an NHS entity, Northwest Center, Inc., to engage in a criminal course of conduct designed to artificially inflate NHS' revenues which would, in turn, then be available to Panaccio and certain of his colleagues and other Defendants herein for their enrichment.  To that end, Panaccio caused Northwest Center, Inc. to begin a pattern of  misrepresentations to state and federal governments of key facts in order to qualify for increased payments.

37.     Such pattern of misrepresentations included:

(a)     Billing for partial hospitalization services rendered by programs whose licenses were issued based on false certifications of staffing.

(b)     Billing for time increments of partial hospitalization services in excess of that provided.

(c)     Billing for partial hospitalization services without adequate psychiatry time per week dedicated to the patients.

(d)     Billing for partial hospitalization therapy sessions with patients far in excess of the required staff-to-patient ratios.

(e)     Billing for partial hospitalization services of a recreational nature.

      (f)     Billing for partial hospitalization program therapy session services that were improperly supervised.

      (g)     Billing for partial hospitalization program services with improper treatment plans and progress notes.

      (h)     Billing for patients in the partial hospitalization program who were so impaired that they were unable to participate in and benefit from the program.

38.     Directly as a result of such conduct, by 1999 NHS, and various of its entities, received millions of dollars in federal and state reimbursements to which they were not entitled.

39.     The United States Department of Justice conducted an investigation of NHS' unlawful conduct.

40.     Following the investigation, the U.S. Attorneys for the Eastern District of Pennsylvania prepared an "Information" (a copy of which is attached hereto and incorporated herein as Exhibit "B"), key findings of which included serial violations of the mail fraud statute, 18 U.S.C. § 1341, and sustained practices of fraud and misrepresentation.

41.     The Government later produced a Plea Memorandum filed in the case against Northwest Center, Inc. (attached hereto as Exhibit "C"), stating that the unlawful conduct "was pervasive and condoned by individuals who exercised a high degree of authority," including certain supervisory and executive personnel.  (Id. at 4-5).

42.     In fact, these acts were performed under the direction of Panaccio, who was, at one point, identified by the Government as a "target", and who throughout the investigation was understood to be the mastermind.

-10-

43.     Panaccio's motives for fraudulently inducing the government to increase

NHS' revenues was clear:  He had personally received, and continued to receive, through the

looting of NHS, extraordinary benefits and compensations far exceeding any reasonable amount,

including the receipt of an annual bonus calculated on gross revenues, which he could not have

received without the significantly increased revenues from the fraudulent activity.  (See detailed

compensation allegations below as well as bonus calculation worksheets attached hereto as

Exhibit "D.")  He -- together with other Defendants -- also needed revenue to loot NHS by means

of Amica Leasing, United Staffing, and the stadium transaction.

44.     After extensive negotiations, internal investigations, and the allocation of

enormous employee and outside professional attention, on May 20, 2002, NHS entered into a

Criminal Plea Agreement (attached hereto as Exhibit "E") and a civil Settlement Agreement

(attached hereto as Exhibit "F").

45.     Included among the demands of the United States Government in

resolving the criminal and civil charges against Northwest Center, Inc. was a penalty and civil

settlement of a combined $7.8 million dollars (referred to by the United States as the "Global

Settlement Amount") to be paid in three installments, $2,200,000 upon entry of the Settlement

Agreement on May 20, 2002; $3,000,000 within 12 months, and the remainder within 24 months,

under the condition that NHS recover insurance assets that Panaccio and other Defendants

wrongfully purchased for themselves with NHS revenues.  As the Settlement Agreement states:

> "This last payment is contingent upon NHS's
> receipt of proceeds from insurance annuity contracts
> held by Northwestern Intrasystems, Inc. and/or
> Northwestern Intrasystems Trust and/or certain
> individual beneficiaries thereof with a total cash

surrender value of Two Million Nine Hundred
Thousand Dollars ($2,900,000).  NHS shall
immediately undertake to obtain these proceeds,
will use its best efforts to do so, and shall do so at
its own expense.  If the payment of the  Two
Million Nine Hundred Thousand Dollars
($2,900,000) is not made within twenty-four (24)
months of the execution of this Agreement, or if
prior to that date, the Government is dissatisfied
with NHS's efforts herein, the Government may, at
NHS' expense, (a) institute litigation as a third party
beneficiary or otherwise against the carrier and/or
any other party to secure the proceeds of the
insurance annuity contracts and/or (b) require NHS
to assign to the Government all of its interests in
said insurance annuity contracts."

(See Exhibit "F", ¶ 1, pg. 5.)

### D.     <u>Panaccio's Fraudulent and Excessive Compensation</u>

46.     Prior to and/or simultaneous with orchestrating NHS frauds on the county,
state, and federal governments, and until he left NHS' employment in June, 2000, Panaccio
together with other defendants herein, conspired to loot NHS of funds by a variety of subterfuges,
including increasing Panaccio's annual compensation and benefits.

47.     Thus, by 1999, Panaccio had orchestrated a scenario under which he
caused NHS to pay him annually in salary, benefits, reimbursements, multiple imported
automobiles, insurances, and secret payments -- amounts exceeding, in some years, more than
one million dollars.

48.     In addition, Panaccio caused NHS to pay for his memberships at two
country clubs, the Union League, and other organizations at a cost of many thousands of dollars
annually.

49.     Further, Defendant Panaccio arranged the leases for his automobiles in such a fashion that the payoff amount at the termination was insubstantial relative to the value of the car.  Thus, once NHS had made the unnecessarily high lease payments, Panaccio could pay the relatively small payoff amount and have a valuable automobile at a greatly reduced price.

50.     Defendant Panaccio, with the aid of others -- some of whom are also Defendants herein -- engaged in a complex series of acts to hide, obfuscate, and prevent detection of his fraudulent activities, including payment to third-parties for no reason other than to provide kick-backs to Panaccio.

51.     Though NHS had a Board of Trustees and a "Compensation Committee" (acting as subcommittee of the Board), the individuals serving on such Board and Committee were either not fully informed, not informed at all, or, in the case of the Compensation Committee, peopled by individuals with conflicts of interest or over whom Panaccio had controlling influence.

52.     Panaccio also disseminated reports to the then sitting Board of Trustees containing false, doctored, and incomplete information, and was himself directly responsible for the Board's failure to be fully or properly informed of NHS' business matters.

53.     Thus, there never was any objective, disinterested, or properly informed oversight of Panaccio's compensations and benefits.

54.     Further, upon Panaccio's departure from NHS, and as a direct result of his deliberate management decisions, there was a wholesale absence of documents and information remaining at NHS which, in the ordinary course of business, should have been maintained, thus hindering -- and for a substantial period of time, preventing -- Plaintiffs herein from learning the

depth and breadth of Defendants' looting.  As a result, Plaintiffs could not, through the exercise

of reasonable diligence, have discovered the facts giving rise to this action sooner.

      E.    **Conflicts of Interest**

      55.    During this same time, Panaccio caused NHS to retain defendants

McKeever and MBG to act as insurance and financial consultants to NHS, for which McKeever

and MBG were paid consulting fees by NHS on an hourly basis.  (Attached hereto as Exhibit "G"

are sample billings submitted by McKeever and MBG to NHS.)

      56.    McKeever and MBG held themselves out as experts in the fields of

financial planning, insurances and related services.  NHS relied on McKeever's and MBG's

purported expertise.

      57.    McKeever also served as a member of the Compensation Committee, and

maintained many of its minutes and records which remain unavailable to NHS.

      58.    Each year, NHS paid thousands of dollars to McKeever and MBG as

consultants, though the full extent of such payments is presently unknown because of incomplete

records at NHS.

      59.    At the same time as being paid as "consultants" to NHS, McKeever and

MBG were also selling insurance products to NHS and receiving substantial sales commissions

from the underwriters, Defendant PM Life and PM Financial, which were never disclosed to

NHS or to its Board of Trustees.

      60.    Further, during this same period, McKeever and MBG were also personal

advisors to Panaccio and other Defendants concerning their private financial and estate planning.

This too was never disclosed to NHS or to its Board of Trustees.

61.     Defendants Panaccio, McKeever, and MBG undertook to enrich themselves at a time when they all knew NHS was struggling financially and could ill-afford either to commit violations of state and federal law or pay Panaccio, McKeever and MBG extraordinary compensations and/or benefits.  For example, in a letter from Panaccio to McKeever, dated October 20, 1999 (attached as Exhibit "H"), Panaccio told McKeever among other things:

> In short, Northwestern, despite its noble mission, lives 'hand to mouth' everyday, having to delay payments to its own vendors and suppliers.  At times, even making payroll is a struggle.

**F.      Creation of Northwestern Intrasystems, Inc. and the Trust of April 1, 1994**

62.     At Panaccio's direction, Northwestern Corporation created the subsidiary "Northwestern Intrasystems, Inc." to be formed as the employer of Northwestern Corporation executives, and to create the Salary Continuation Trust ("Trust") for Panaccio's benefit.

63.     On April 1, 1994, Defendants Panaccio, McKeever and MBG caused the Trust to be formed by way of a Trust Agreement dated April 1, 1994, by and between NI, McKeever and Craig L. Battle, then a member of the Compensation Committee of NHS. (Said Trust Agreement is attached hereto and made a part hereof as Exhibit "I".)

64.     The stated purpose of the Trust was to fulfill the obligation of NI and NHS for the "salary continuation" of key executives of NHS, but in reality was created so that Defendants Panaccio, McKeever and MBG could ensure their enrichment long after their

association with NHS.  Particularly with respect to Panaccio, the amounts of benefits payable under the salary continuation agreements and the Trust are excessive and abusive.

65.     In creating the Trust, Panaccio authorized the appointment of  McKeever as one of the only two trustees, multiplying his conflicts of interest.  McKeever thereafter served as Trustee of the Trust from its inception until his resignation, following Panaccio's departure from NHS.

66.     The following individuals, each of whom were loyal to Panaccio and were willing to consent to Panaccio's creation of the Trust for their own benefit, were provided with "salary continuation" agreements and thereafter made beneficiaries of the Trust:

| | |
|---|---|
| Robert C. Panaccio | {See Exhibit "J"} |
| Shirley E. Barr | {See Exhibit "K"} |
| Joseph J. Patrick | {See Exhibit "L"} |

67.     A number of individuals, who were not necessarily loyal to Panaccio, but who were nevertheless granted salary continuation agreements -- in *di minimus* amounts compared to Panaccio and Patrick largely to make it appear that such agreements were granted to all high level executives -- each renunciated and surrendered any entitlement under any such agreements.

68.     Defendants, Panaccio and Barr have been receiving, and are scheduled to continue to receive millions of dollars in salary continuation benefits, having refused to renunciate or surrender any such benefits.

69.     In connection with funding the Trust to fulfill the salary continuation obligations, Panaccio, McKeever and MBG arranged for NHS, NI, and the Trust to acquire from,

and pay the Provident Defendants for, the following policies of insurance with the following

death benefits, account values, and surrender values:

| Balance Date | Insured | Policy Number | Death Benefit | Account Value | Surrender Value | Contract Type |
|---|---|---|---|---|---|---|
| 6/30/00 | Robert C.Panaccio | O204177020 | $582,667.00 | $582,667.00 | $577,324.00 | Flexible premium deferred variable annuity |
| 6/30/00 | Robert C.Panaccio | 1190001680 | $664,281.00 | $369,281.00 | $367,274.00 | Flexible premium variable universal life |
| 6/30/00 | Robert C.Panaccio | 4128523 | $1,493,454.00 | $666,650.00 | $666,650.00 | Other life product |
| 6/30/00 | Robert C.Panaccio | 7100577 | $286,861.00 | $122,396.00 | $122,396.00 | Other life product |
| 6/30/00 | Robert C.Panaccio | 7105194 | $250,000.00 | $82,822.00 | $82,822.00 | Other life product |
| 6/30/00 | Robert C.Panaccio | 7120331 | $266,507.00 | $101,935.00 | $101,935.00 | Other life product |
| 6/30/00 | Robert C.Panaccio | 1190763950 | $1,014,245.00 | $14,245.00 | $9,870.00 | Flexible premium variable universal life |
| 6/30/00 | Shirley E. Barr | O204176970 | $35,624.00 | $35,624.00 | $35,269.00 | Flexible premium deferred variable annuity |
| 6/30/00 | Joseph J. Patrick | O204177030 | $193,297.00 | $193,297.00 | $191,513.00 | Flexible premium deferred variable annuity |
| 6/30/00 | Joseph J. Patrick | 4168694 | $304,242.00 | $104,613.00 | $104,613.00 | Other life product |
| 6/30/00 | Joseph J. Patrick | 4209070 | $238,295.00 | $75,242.00 | $75,242.00 | Other life product |
| 6/30/00 | Joseph J. Patrick | 4263159 | $509,756.00 | $99,122.00 | $99,122.00 | Other life product |

70.     No effort was made to solicit competitive bids for these products.

71.     Panaccio retired just two years after the implementation of his Salary

Continuation Agreement, and since then has been receiving salary continuation payments of

$186,791.50 annually.  The Account Value of Panaccio's policies alone is $1,928,271.

72.     As to each of the policies and annuities sold by the Provident Defendants,

McKeever and MBG received, and continue to receive, sales commissions which were never

disclosed to NHS' Board of Trustees.

73.     Collectively, the policies and annuities cost NHS hundreds of thousands of

dollars in annual premiums, cumulatively have cost NHS well in excess of two million dollars

since 1994, and currently have a collective Account Value of $3,031,962.

74.     In structuring the terms of the salary continuation agreements, Panaccio,

McKeever and MBG also provided unfavorable provisions to NHS, examples of which follow:

(a)     The benefits payable are unrelated to any past number of years of
service.

-17-

(b)     The benefits payable are unrelated to any future number of years of service.

(c)     The benefits are payable even in the event of a termination for cause.

(d)     There are no penalties to the employee for a quick separation from employment.

(e)     The stated percentages of salary benefits are exorbitant and unreasonable.  For example, Panaccio is to receive an amount equal to seventy-percent (70%) of his last three years salary for each year during the remainder of his lifetime (up to twenty years).

(f)     The agreements call for continued payment of full benefits to spouses (as opposed to reduced benefits) upon the death of the participant; and, in Panaccio's case, even after his spouse dies, his children are to receive full benefits during their lifetime.

These unfavorable provisions were never properly disclosed to the Board of Trustees.

75.     Such provisions, among other things, directly contradict the stated purposes of the Trust and the salary continuation agreements, which were to provide incentives for the long-term, continued employment of key employees of NHS, and in fact did the opposite: created an incentive for each to promptly terminate his/or her relationship with NHS to obtain lifetime personal benefits.  These provisions were never disclosed to the Board of Trustees.

76.     In establishing the multitude of payment arrangements, including the salary continuation agreements and the provisions of the Trust, Panaccio, McKeever and MBG had irreconcilable conflicts of interests and violated even the most minimal standard of duty owed by fiduciaries.

77.     Indeed, so incestuous and self-aggrandizing was the relationship between Panaccio and McKeever that, at one point, after assigning NHS policies to Panaccio for his own

estate planning purposes, McKeever informed Panaccio, in a letter dated April 19, 2001, that

Panaccio was entitled to reimbursement of the $19,828 NHS had paid for the policy.  Nevertheless,

McKeever recommended that Panaccio pay NHS a mere $5,063, the cash surrender value.

> "The cash value at the time of your departure was
> $5,063 and I'm sure that is the minimum which the
> Corporation would require for reimbursement on this
> policy.  The actual layout by the Corporation totaled
> $19,828.  What should you do?  I feel I must
> recommend that you pay the Corporation $5,063
> which was the cash net value if the policy had been
> surrendered which it would have been had it not been
> transferred to your trust.
>
> Let's talk about this at your first convenience."

(See letter attached hereto as Exhibit "M.") (At the time McKeever was taking both commissions

and a consulting fee from NHS, was on the Compensation Committee at NHS, and was a financial

consultant both for NHS and for Panaccio personally.)

78.     Neither the $5,063 nor the $19,828 was ever paid to NHS.

### G.     The Amica Looting Frauds

79.     Panaccio also established at least one separate, for-profit entity, Amica, to

facilitate his looting of NHS. The ostensible purposes of this entity was to provide to NHS

equipment and vehicle financing.

80.     In creating Amica, it was Panaccio's plan to enrich himself and others --

including Flaherty -- by providing themselves with numerous luxury automobiles -- including

BMW's and Mercedes Benz's -- either by way of leases, or sales, or a combination of both and by

secretly removing cash on a monthly basis.

81.     Panaccio caused Amica to be formed as a subsidiary of Northwestern Enterprises, Inc., installing on its Board of Directors himself and Flaherty along with The Honorable Armond Della Porta, Frances Tarquini, Esquire, and Frank Ecock.

82.     From at least the early 1990's until Panaccio's departure from NHS, Panaccio caused NHS to maintain a fleet of 400 vehicles, many of which were unnecessary.

83.     Further, whether necessary or not, many leases were structured such that NHS was forced to pay far in excess of market value (e.g., $1,179 monthly for a Ford Explorer) so as to (1) allow Amica to develop extraordinary cash surpluses which Panaccio, Patrick and Flaherty could then siphon off;  and (2) to create a cash buyout option to Panaccio and his colleagues far below the lease-end market value of such vehicles.

84.     Thus, Panaccio at times had as many as three vehicles issued to him and his family members (see Exhibit "N," NHS Executive Car Line Inventory dated 7/97).

85.     Panaccio also used the very considerable funds available to Amica by way of NHS' overpayments (at times as much as $4 million dollars) to fund various other improper self-serving schemes.

86.     Thus, by way of example only, Panaccio's son, Robert Panaccio, Jr., was installed on Amica's payroll -- even during a time when he was a student at veterinary school -- in exchange for little or no work.

87.     As to such payroll payments made to Panaccio's son, said checks were, at least in several instances, sent to the son through the use of the United States mails, and were thereafter processed through the United States Federal Reserve banking system.  Further, in each of at least

-20-

three years during which such payroll payments were made to Panaccio, Jr., year-end W-2 forms were caused to be forwarded to Panaccio, Jr. through the use of the United States mail.

88.  By way of another example, Amica entered into a series of transactions with another vehicle leasing company, Fleetway Leasing ("Fleetway") which was guaranteed to make Fleetway money at NHS' expense, as follows:

(a)  Acquisition of vehicles by Amica from Fleetway, at prices in excess of Fleetway's cost;

(b)  Payment of a $5,000 monthly "consulting fee" to Fleetway;

(c)  The option for Fleetway to purchase vehicles as the end of the lease term in a manner guaranteed to benefit it: if, at the end of such vehicle-lease terms, the vehicle sold at auction or otherwise for an amount in excess of its surrender value, Fleetway had the option of "purchasing" the vehicle and keeping the profit, but if at auction the vehicle sold for less than its surrender value, NHS was caused to make up the shortfall.

89.  On information and belief, Panaccio and/or others under his authority and affiliated him with benefitted from the concessions granted Fleetway.

90.  As yet an additional scheme to loot money from Amica, Panaccio caused Amica to pay to third-parties "C" corporation 1, "C" corporation 2, Mr. "P." and Mr. "B"[2] a series of payments, examples of which follow:

| Date | | Amount | Payee |
|------|---|--------|-------|
| 01/10/95 | $ | 6,300.00 | C1 |
| 04/11/95 | $ | 287.42 | C1 |
| 04/19/95 | $ | 4,200.00 | C1 |
| 05/04/95 | $ | 287.42 | C1 |
| 05/12/95 | $ | 2,100.00 | C1 |
| 06/19/95 | $ | 2,100.00 | C1 |
| 09/18/95 | $ | 2,100.00 | C1 |
| 10/19/95 | $ | 2,100.00 | C1 |

---

[2]  Pseudonyms are used here because such third-parties are not named Defendants.

| | | | |
|---|---|---|---|
| 12/07/95 | $ | 2,100.00 | C1 |
| 12/28/95 | $ | 2,100.00 | C1 |
| 01/24/96 | $ | 2,100.00 | C1 |
| 02/07/96 | $ | 2,100.00 | C1 |
| 03/22/96 | $ | 2,100.00 | C1 |
| 04/10/96 | $ | 2,100.00 | C1 |
| 05/31/96 | $ | 2,100.00 | C1 |
| 06/12/96 | $ | 2,100.00 | C1 |
| 07/11/96 | $ | 2,100.00 | C1 |
| 08/07/96 | $ | 4,200.00 | C1 |
| 08/29/96 | $ | 3,700.00 | C1 |
| 09/19/96 | $ | 3,700.00 | C1 |
| 06/13/97 | $ | 201.97 | C1 |
| 06/13/97 | $ | 218.61 | C1 |
| 12/04/97 | $ | 3,700.00 | C1 |
| 10/24/94 | $ | 2,200.00 | C2 |
| 10/12/95 | $ | 350.00 | C2 |
| 11/21/95 | $ | 1,600.55 | C2 |
| 05/03/96 | $ | 1,000.00 | C2 |
| 04/21/98 | $ | 700.00 | C2 |
| 06/30/98 | $ | 575.00 | C2 |
| 07/16/98 | $ | 1,150.00 | C2 |
| 09/10/98 | $ | 600.00 | C2 |
| 10/24/94 | $ | 793.25 | Mr. P |
| 11/18/94 | $ | 680.00 | Mr. P |
| 03/07/95 | $ | 780.00 | Mr. P |
| 03/07/95 | $ | 575.00 | Mr. P |
| 03/17/95 | $ | 570.00 | Mr. P |
| 03/23/95 | $ | 780.00 | Mr. P |
| 04/19/95 | $ | 930.00 | Mr. P |
| 05/12/95 | $ | 1,515.00 | Mr. P |
| 06/19/95 | $ | 1,090.00 | Mr. P |
| 06/27/95 | $ | 1,140.00 | Mr. P |
| 07/25/95 | $ | 570.00 | Mr. P |
| 07/25/95 | $ | 1,070.00 | Mr. P |
| 08/24/95 | $ | 700.00 | Mr. P |
| 01/10/97 | $ | 6,000.00 | Mr. P |
| 07/15/97 | $ | 625.00 | Mr. P |
| 07/18/97 | $ | 1,100.00 | Mr. P |
| 11/18/94 | $ | 200.00 | Mr. B |
| 01/10/95 | $ | 800.00 | Mr. B |
| 04/19/95 | $ | 200.00 | Mr. B |
| 05/12/95 | $ | 200.00 | Mr. B |
| 07/24/95 | $ | 400.00 | Mr. B |
| 08/07/95 | $ | 200.00 | Mr. B |
| 09/18/95 | $ | 200.00 | Mr. B |
| 10/19/95 | $ | 200.00 | Mr. B |
| 11/21/95 | $ | 200.00 | Mr. B |
| 12/28/95 | $ | 200.00 | Mr. B |
| 01/24/96 | $ | 200.00 | Mr. B |

| | | | |
|---|---|---|---|
| 02/07/96 | $ | 200.00 | Mr. B |
| 03/11/96 | $ | 200.00 | Mr. B |
| 05/17/96 | $ | 200.00 | Mr. B |
| 06/12/96 | $ | 200.00 | Mr. B |
| 07/11/96 | $ | 200.00 | Mr. B |

91.     The payments made to "C" corporations 1 and 2, Mr. "P." and Mr. "B."
were made by a series of checks drawn on the account of "Amica," were caused by Panaccio to
be forwarded through the United States mails on or about the dates such checks were drawn, and
further caused to be processed though the United States Federal Reserve banking system.  Such
checks (with the exact identity of the payee redacted for purposes of this Complaint) are attached
hereto as Exhibit "Z."

92.     Upon information and belief, such improper payments were made for
years dating back to as early as 1990, but the records are incomplete.

93.     Such payments were made without business justification, and in no way
benefitted NHS or Amica.

94.     The reason for such payments were so that the "C" 1 corporation could
issue a series of kick-back payments directly to Panaccio under the guise of "consulting fees,"
during the same years.

95.     For the years 1990-1996, Panaccio received approximately $18,000 per
year from C-1 corporation.

96.     No such payments received by Panaccio were ever disclosed to NHS,
Amica, to either entity's Board of Directors.

H.    **The Bowers Looting Scheme**

97.    Further still, Panaccio siphoned cash directly from NHS by utilizing an outside accountant, Bowers, who created a secret bank accounts over which NHS' regular accountants were excluded.

98.    Payments made by Bowers from the secret bank accounts he controlled during the years 1997 through 2000 in order to illegally benefit Panaccio at NHS' and Amica's expense included but were not limited to:

a)    payments to American Express in excess of $65,000;

b)    bi-weekly payments to Panaccio personally of $2,500 each, totaling in excess of $200,000;

c)    payments to Panaccio's personal dentist in excess of $3,800;

d)    payments to florist and caterers serving Panaccio's personal residence in excess of $20,000; and

e)    payments for memberships at golf and other clubs, and sporting event season tickets in excess of $50,000.

(Representative samples of such payments, in the form of cancelled checks drawn on accounts controlled by Bowers, are attached hereto as Exhibit "AA.")

99.    At all relevant times, Bowers knew he was using NHS' funds to pay the personal, non-reimbursable expenses of Panaccio and others and thereby cheating NHS.

100.    In order to fund the secret accounts, Panaccio caused NHS' CFOs to forward monies to Bowers – sometimes as much as $15,000 per month – who, in turn, would deposit such monies in such secret accounts and use such funds to make the aforesaid payments. Such CFOs were given no information either by Panaccio or Bowers as to the purpose of the

-24-

transfer of such funds, whether such transfers of funds were properly authorized by NHS, or the precise manner by which Bowers would be utilizing such funds.

101.    Bowers signed each of the checks from the secret accounts.

102.    Bowers personally caused the United States mails and Federal Reserve banking system to be utilized to facilitate actual delivery to Panaccio of the foregoing described fraudulent monies.

103.    Bowers personally received and reviewed all invoices as against which such fraudulent payments were made.

104.    At all relevant times, Bowers knew the bank accounts he managed were secret bank accounts, and that the NHS Board, NHS Compensation Committee and/or NHS' auditors were unaware of them.  Indeed, Bowers had, for many years during the 1990's, served as an employee-accountant for another NHS for-profit subsidiary, United Staffing Company, and thus knew of the corporate structure of NHS, its various subsidiaries, knew the identify of and role played by its outside auditors, and knew he was, in connection with the Amica looting scheme described herein, circumventing the proper lines of authority and review.

105.    Bowers knew that by making such payments, he was unlawfully siphoning funds from NHS and its subsidiaries to Panaccio and others and that he was participating in a fraudulent scheme.

106.    Without proper authorization from NHS, Bowers also made payments to himself in the form of "fee for services" with NHS' funds from the secret bank accounts he maintained and managed, and in that regard received in excess of $40,000.

107.    The use of the United States mail was integral to these series of transactions, because each and all such looting payments were accomplished via checks forwarded to the respective payees through the United States mails and processed through the United States Federal Reserve banking system.

108.    The abuse by Panaccio and Bowers and the self-dealing transactions, such as those described above, were never disclosed to the NHS Board of Trustees.

**I.      The Stadium Looting Fraud**

109.    During the mid to late 90's, Panaccio arranged with NHS' then (and now former) chief financial officer and board member, Flaherty to enter into a series of transactions involving the development of a minor league baseball stadium in the Lehigh Valley, for purposes of benefitting Panaccio and Flaherty at the expense of NHS.

110.    Panaccio, for his part, secretly arranged for NHS to purchase certain real property from Flaherty and/or various of his entities in Allentown, Pennsylvania at an inflated price, and then made commitments to Flaherty and his entities, the Atlantic League of Professional Baseball Clubs, and the Lehigh Valley Industrial Development Corporation providing that NHS would develop a baseball stadium suitable for professional baseball.  In this regard, and without disclosure to, or authority from, the Board of Trustees, Panaccio caused NHS to issue a series of multi-million dollar commitments and guarantees on NHS' behalf, and to separately expend in excess of a million dollars, to benefit Flaherty, and on information and belief, Panaccio and others unknown as yet.

111.    Since approximately June 1998, Panaccio recommended to the NHS Board of Trustees that it acquire a minor league baseball and soccer stadium to be constructed by Flaherty on property owned by NHS in Northampton County, Pennsylvania.

112.    At Panaccio's urging, the Trustees approved a plan for NHS to acquire the stadium, but only as a gift after Flaherty built it.

113.    According to the plan approved by the Trustees, Flaherty was to build the stadium and then donate the stadium to NHS.    (See Exhibit "O," Board Minutes dated 4/30/98 at 9 and 7/30/98 at 10-11, and Minutes of Meeting of Combined Finance and Executive Committees dated 6/18/98 at 13-14.)

114.    At the time he urged the Board to approve this plan, Panaccio and Flaherty failed to disclose to the Board ofTrustees that Flaherty had no independent ability to pay for the construction of the stadium.  Panaccio and Flaherty also failed to tell the Board of Trustees that NHS had to, and did, purchase the property.  (Exhibit "P, " Stadium Committee Minutes dated 12/23/99.)

115.    Because of Flaherty's inability to pay for construction, Defendants Panaccio and Flaherty formed a plan to finance the construction of the stadium using NHS funds.

116.    At no time did Panaccio or Flaherty tell the Board of Trustees of this plan.

117.    On the contrary, at various times beginning in June 1998, Panaccio and/or Flaherty told the Board of Trustees and its various operating committees that no NHS funds were being used to finance the construction of the stadium.  Panaccio and Flaherty even allowed representatives of NHS and the Board of Trustees to provide similar assurances to government agencies that license and pay for NHS' operations.

118.    Despite the assurances made to the Board of Trustees that Flaherty would build the stadium using his own funds, beginning on or about August 15, 1998, Flaherty and Panaccio entered into agreements for NHS to buy a separate building owned by Flaherty and located at 201 Larry Holmes Drive, Easton, Pennsylvania ("Larry Holmes Drive property"). The purpose of this agreement was to provide Flaherty with money to construct the stadium.

119.    The use of the United States mail was integral to the implementation of this series of transactions.

120.    Neither Flaherty nor Panaccio or anyone acting for them, ever told the Board of Trustees that Flaherty and Panaccio were now arranging for NHS to finance the construction of the stadium.

121.    Panaccio, without approval from anyone, committed NHS to act as guarantor of all of the construction costs and the long-term debt for the stadium, then estimated at between ten million and thirteen million dollars.

122.    Without informing the  Board of Trustees, on May 15, 1998, Panaccio signed a Land Development Agreement in conjunction with Flaherty.

123.    On May 29, 1998, once again with no authority of any kind from the NHS Board of Trustees and without disclosing the same to the Board, Panaccio entered into a "Bridge Loan Agreement" with Flaherty, providing more than $400,000 to Federal Development Company, the stadium developer and a company owned or controlled by Flaherty.  Under the terms of the loan, repayment of the full amount was due on or before September 15, 1998, when Flaherty had represented that he would obtain full, independent funding of the stadium's construction costs.  On June 2, 1998, NHS transferred the full amount of the loan to Flaherty's

company.  Repayment of this so-called loan was unsecured by any collateral. This loan was never repaid.

124.     Under the agreements to buy the Larry Holmes Drive property signed by Flaherty and Panaccio, purportedly on behalf of NHS, Flaherty would receive $1, 750,000 for the property.

125.     Flaherty had purchased the property just four years earlier, for approximately $874,000, yielding more than a $900,000 profit for Flaherty.

126.     Neither Flaherty nor Panaccio, nor anyone acting for them, ever disclosed to the Board of Trustees that NHS was buying Larry Holmes Drive property from Flaherty (see Exhibit "P," Minutes of Stadium Committee Meeting dated 12/23/99 at 1) or that NHS funds were being used to provide an interested Trustee with such a large profit as part of the transaction.

127.     Flaherty has a direct and substantial financial interest in the businesses that were to benefit from Panaccio's and Flaherty's agreements.

128.     The so-called agreement of sale dated August 15, 1998, contained a provision that made the agreement contingent upon Board approval of the transaction, and provided, further, that, if Board approval did not occur, any monies paid as deposit funds would be repaid by Flaherty to NHS.  (See Exhibit "Q.")

129.     Later, however, on December 23, 1998, Flaherty and Panaccio revised their agreement for the sale of the Larry Holmes Drive property so that, although the agreement remained contingent upon Board approval, it no longer contained a provision requiring the return

of any deposited funds if the Board approval was never obtained.  Flaherty and Panaccio made this revised agreement effective retroactively to December 15, 1998.  (See Exhibit "R.")

130.    The intent behind this transaction was, in reality, to cause NHS to breach the agreement, and to unjustly enrich Flaherty with an $800,000 deposit forfeiture, and this is exactly what occurred.

131.    Breaching normal business patterns and practices, Panaccio did not obtain any review of this agreement by any legal counsel working for NHS.  Instead, he kept the agreement secret.

132.    On September 16, 1998, Panaccio signed a "Cooperation Agreement" with Flaherty and Northampton County.  Therein, he agreed that NHS would be jointly and severally liable with Flaherty for providing all necessary private funds to build the stadium.  This Agreement committed NHS to pay the full cost of the stadium, all $13 million if necessary, if Flaherty failed to obtain a loan or if he could not repay the loan he did obtain.

133.    On December 17, 1998, exactly two days after the effective date of their revised agreement, Panaccio instructed Thomas Donaghue, Chief Financial Officer of NHS, to pay $300,000 to Flaherty for the Larry Holmes Drive property.

134.    Also, on December 17, 1998, the same day that he was ordering Thomas Donaghue to pay Flaherty $300,000, Panaccio simultaneously signed an agreement with First Union Bank that declared that "Northwestern has determined not to be a part of the Lehigh Valley Project."  The purpose of the agreement was to provide for the orderly disengagement of Northwestern from the stadium project.  First Union ordered NHS out of the stadium deal entirely and at the earliest possible time.

135.    Donaghue made the payment of the $300,000 to Flaherty on December 18, 1998, after, and only because, Panaccio falsely told him that the Board of Trustees had approved the payment.

136.    Said transfer occurred without the knowledge or the approval of the NHS Board of Trustees.  In fact, no one on the NHS Board of Trustees, except Panaccio and Flaherty, knew of the payment from NHS to Flaherty.

137.    On December 4, 1998, Panaccio executed a Surety Bond "as per Tom Flaherty's instructions," to Williams Township, where the stadium was to be built.  That Surety Bond was intended to guarantee the performance of site improvement work as agreed in the Land Development Plan signed by Panaccio in May.  The bond placed $463,272.10 of NHS' funds in escrow with an insurance company for the Township.

138.    On February 17, 1999, the Surety Bond was executed without disclosure to, or knowledge of, the Board of Trustees.  Panaccio signed another Surety Agreement on the stadium property, this time committing $339,514 in NHS funds to guarantee ongoing work at the site.  This Surety Agreement was executed without disclosure to, or the knowledge of, the NHS Board of Trustees.

139.    Several months after the first payment on the Larry Holmes Drive property, in April 1999, a second payment of $500,000 was paid under the revised Panaccio-Flaherty agreement, which now also contained a provision that the payments to Flaherty would be retained by him as liquidated damages if final settlement did not occur on May 1, 1999.  This payment was made without disclosure to, or the knowledge of, the Board of Trustees.

140.    In addition to making misrepresentations regarding the uses he intended for NHS' funds, and in addition to transferring funds to Flaherty without authority, Panaccio also ordered the execution of documents, purportedly on behalf of NHS, asserting that a Flaherty-owned corporation had deposited $200,000 of stock certificates into an escrow account controlled by NHS, which deposit was apparently a requirement for Flaherty to continue the ownership of his minor league baseball team franchise.

141.    The purpose of the escrow account document was to maintain eligibility of Flaherty's baseball team to participate in the Atlantic baseball league by assuring the league that Flaherty's team was financially viable.

142.    To provide assurances for Flaherty, either Panaccio or Flaherty ordered the creation of the escrow documents, which made NHS an escrow agent on behalf of Flaherty, thereby obliging NHS to pay $200,000, or its equivalent in stock certificates, on demand to the Atlantic League.

143.    These escrow documents were signed by Panaccio's Executive Assistant, at Panaccio's direction, purportedly on behalf of an NHS subsidiary.  No members of the Board of Trustees of NHS, except Panaccio and Flaherty, knew of the execution of these documents. The Board of Trustees never knew of, nor approved, making NHS an escrow agent on behalf of Flaherty.  Panaccio and Flaherty never disclosed the same to the Board of Trustees.

144.    Worse, the escrow documents were completely false.  No funds and no stock certificates were ever actually placed into escrow.

145.    Panaccio's actions in causing the creation of these false escrow documents has placed the continuing credibility of NHS at risk with its funders, licensors, and creditors, and

has subjected NHS to legal action by the Atlantic League to collect its money or otherwise cure the results of the false statements contained in the escrow agreement.

146.    By July 1999, construction at the stadium site stopped because Flaherty failed to pay the bills.  At that point, an outside financier, or "factor," stepped forward and agreed to pay the contractors by purchasing their accounts receivable.  It would do so, however, only if NHS acknowledged that Flaherty had acted in all actions as NHS' agent and that, in fact, payments due from Flaherty were actually debts owed by NHS.  At a combined Finance and Executive Committee meeting on July 2, 1999, Panaccio presented the deal to the Committees, but failed to tell them that the factor required NHS to acknowledge that Flaherty had acted as NHS's agent and the debts were owed by NHS.  Laboring without all the relevant facts, the Committees conditionally approved the deal.

147.    Panaccio ignored the limit imposed by the Executive Committee and the Board and proceeded to sign an agreement accepting responsibility to pay the factoring agent $2,759,024.00.  NHS is now a Defendant in legal proceedings to collect those monies.

148.    Ultimately, Flaherty caused one of the entities to file for bankruptcy,  and NHS was stuck with a seven million dollar investment commitment in a half built stadium of significantly reduced value.

149.    NHS does not yet have sufficient records with which to determine all of the benefits gained by Flaherty, his entities, Panaccio, or others, from these transactions, but reasonably believes to have been damaged in a way consistent with the other mechanisms used by Panaccio to loot NHS.

### J.      Additional Suspect Transactions

150.     NHS also reasonably believes there to be yet additional transactions designed or implemented in such a way as to improperly benefit others at NHS' expense, and hereby reserves the right to seek leave of the Court to amend this Complaint to set forth the details and damages of such other transactions upon the discovery of the same.

151.     For example,  McKeever and MBG arranged with Panaccio for NHS to establish a captive liability insurer, Mental Health Risk Retention Group, Inc. ("MHRRG"), to underwrite its general and professional liability insurance coverages.  McKeever and MBG advised Plaintiffs to undertake such a course of action without performing adequate price comparison between the formation of the captive company and the cost of professional liability insurance on the open market at that time, and caused NHS to pay insurance premiums to MHRRG far in excess of what comparable insurance would cost on the open market.

152.     Panaccio and McKeever arranged for McKeever to have a seat on the Board of Trustees on MHRRG, representing yet another conflict of interests.

### K.      Various Predicate Acts

153.     Defendants Panaccio and Flaherty and various other Defendants repeatedly used the mails and interstate wires to further their scheme of committing medicare and medicaid fraud and stripping assets from NHS by fraudulently causing NHS to pay them exorbitant compensation, either in the form of unearned salaries, premiums, consulting fees, commissions, compensation plans, insurance and annuity products,  automobiles, credit cards, expense accounts, and memberships in social and private organizations.

154.   For example, Panaccio and others under his direction, for the purpose of executing a scheme and artifice to defraud, and attempting to do so, knowingly caused to be delivered by the U.S. Postal Service, on or about November 18, 1996, a check in the amount of $4,372.50 payable to the Northwest Center from the Commonwealth of Pennsylvania Department of Welfare.  This check represented Medicaid payment for services purportedly rendered by NHS.

155.   In addition, on or about September 15, 1997, MBG sent a copy of the Trust Agreement from its office in Radnor, PA through the U.S. Postal Service to NHS at 620 Germantown Pike, Lafayette Hills, PA 19444.  (See correspondence attached as Exhibit "S.")  Defendants Panaccio and various other defendants either caused said documents to be mailed and/or could have foreseen the use of the mails in furtherance of their fraudulent scheme.

156.   Panaccio continued to use the U.S. Postal Service in furtherance of this scheme, as demonstrated by the correspondence, dated March 18, 1998, April 7, 1998, February 24, 1999, May 6, 1999, and April 25, 2000 attached as Exhibit "T."  This correspondence, all of which deals with the administration of the insurance policies held by the Trust, was always sent Personal/Confidential.

157.   In furtherance of the scheme to defraud, Bowers made regular use of the United States mails to administer the secret accounts, to receive instructions from Panaccio on when and how to make unlawful transfers of NHS funds, and to make such transfers.  Bowers' use of the United States Mails includes, but is not limited to, those transmissions attached hereto as Exhibit "U," which documents are incorporated herein by reference.  It also includes, but is not limited to, any and all mailings reflected in, suggested by, or deducible from the documents

attached hereto as Exhibit "U." For example, as evidenced by Exhibit "U," it includes all

payments mailed to credit card issuers and vendors of goods and services made on Panaccio's

behalf.

158.    Further, Panaccio caused various account statements to be mailed to him

regarding various annuity and insurance policy matters through the United States mail.

159.    Starting in or around June 2000 and continuing at least through July 2002,

Panaccio caused to be mailed monthly checks in the amount of $12,230.60 from Provident

Insurance Company. Such checks were sent from Provident's Wilmington, Delaware service

center through the U.S. Postal Service either to Panaccio directly at 40 Dunminning Road,

Newtown Square, PA 19073 or to the Trust at 620 Germantown Pike, Lafayette Hill, PA 19444.

Copies of the Statements of Account (dated 7/27/00, 6/07/01, 5/11/01 and 9/18/01) and

Confirmations of Partial Withdrawal (dated 5/10/01, 6/6/01 and 9/17/01) that upon information

and belief are issued along with each monthly check are attached as Exhibit "V."

160.    Upon information and belief, Panaccio, Bowers, Amica and United

Staffing as well as other individual Doe Defendants used the mails in furtherance of the scheme

to loot NHS by:

    (a)    Sending instructions through the U.S. mails to Barry Bowers
        regarding to whom he should issue checks from the secret bank
        accounts that he administered;

    (b)    Accepting checks issued from the secret bank accounts and mailed
        by Barry Bowers;

    (c)    In connection with Amica Leasing, sending checks either through
        the U.S. mails or through some interstate carrier to BMW Financial
        Services NA, Inc. in Louisville, Kentucky;

(d)     Other similar uses of the U.S. mails and interstate carriers; and

(e)     Other uses of the U.S. mails and interstate carriers that will be revealed through discovery.

161.   Upon information and belief, Panaccio, Flaherty and other Defendants used the U.S. mails and interstate carriers in furtherance of the scheme to loot NHS funds to build the Lehigh Valley stadium by:

(a)     Sending correspondence to, and receiving correspondence from, the  Atlantic League of Professional Baseball Clubs, headquartered in Camden, New Jersey, regarding the fraud involving the stocks that were never placed in escrow;

(b)     Sending correspondence to, and receiving correspondence from, Northampton County, the Commonwealth of Pennsylvania, Flaherty and Panaccio regarding the construction of the stadium;

(c)     Other similar uses of the U.S. mails and interstate carriers; and

(d)     Other uses of the U.S. mails and interstate carriers that will be revealed through discovery.

162.   Defendants' fraudulent scheme and unlawful use of the mails and wires in furtherance of the fraudulent scheme began in the late 80's or early 90's and continued through June 2000.

## V.  RELIEF REQUESTED

### COUNT I

### All Plaintiffs v. Panaccio, Bowers, Flaherty,
### John Does, Jane Does and Doe Entities

### Violation of 18 U.S.C. § 1962 (c) (RICO)

163.    Plaintiffs hereby incorporate all other paragraphs in this Complaint as though fully set forth herein at length.

164.    At all times relevant hereto, there existed an "enterprise" as defined pursuant to 18 U.S.C. § 1961 (4), affecting interstate Commerce consisting of the combination in fact of NHS, Panaccio, McKeever, MBG, Amica and Flaherty.

165.     The enterprise consisted of the combination in fact of Panaccio, McKeever, MBG, Amica and Flaherty.  The purpose of the Defendants' participation in this enterprise was, and still is, the unlawful enrichment of the Defendants by siphoning off money from the NHS entities.

166.    The enterprise was an ongoing organization with a framework or structure for carrying out decisions.  Specifically, Panaccio was the chief decision making authority.  He used his position at NHS to siphon money from NHS, including the purchase of insurance products from McKeever and MBG, the manipulation of McKeever in his role as consultant to NHS and as a Compensation Committee member, the misuse of Amica, the use of Bowers and his secret accounts, and the use of Flaherty to defraud NHS in connection with the baseball stadium project.  Other enterprise participants and their employees and agents followed Panaccio's instructions and/or commands with respect to both the Medicaid/Medicare fraud and

the looting.  It was McKeever's and MBG's job to facilitate the looting of NHS by supplying

various insurance and annuity products, and by using McKeever's position on the Compensation

Committee to implement excessive and unlawful forms of remuneration and/or misrepresent or

fail to disclose to the NHS Board or independent members of the Board the nature of such

compensation.   On information and belief, Flaherty was aware of the looting. Panaccio directed

the use of Amica to divert NHS assets to himself, his family and associates.  He utilized his

position at NHS to divert funds to Flaherty and himself through the stadium fraud.

167.    Defendants Panaccio and Flaherty knowingly and willfully conducted or

participated directly or indirectly in the conduct of the enterprise's affairs through a pattern of

racketeering activity.

168.    The pattern of racketeering activity perpetrated by the Defendants

included, but was not limited to:

(a)     Repeated acts of mail fraud in violation of 18 U.S.C. § 1341 in
        connection with looting NHS for the benefit of Panaccio, Flaherty
        and certain of the Defendants herein.

(b)     Repeated acts of wire fraud in violation of 18 U.S.C. § 1343 in
        connection with looting NHS for the benefit of Panaccio, Flaherty
        and certain of the Defendants herein.

The fraudulent scheme and instances of mail fraud are described more fully hereinabove.

169.    Defendants effectuated their scheme by engineering a multitude of

subterfuges by which to loot NHS of the ill-gotten gains, using the United States mail and wires.

170.    Defendants' mail and wire fraud  was composed of discrete acts having the

same or similar purposes, results, participants, victims or methods of operation, or otherwise

were interrelated by distinguishing characteristics and are not isolated events.  All such predicate

acts had looting NHS as their goal.

171.    As alleged hereinabove, the fraudulent scheme began in the late 80's or

early 90's and continued at least through Panaccio's departure in June 2000.   Indeed, by virtue of

the continuing impact on the Trust, Defendants continue to perpetuate their fraudulent scheme

and will perpetuate the said acts indefinitely into the future.

172.    As a direct and proximate result of said Defendants' activities, Plaintiffs

have sustained harm, including, but not limited to, millions of dollars funneled from NHS to

Defendants in the form of salaries, premiums, consulting fees, compensation plans, insurance and

annuity products, sales commissions, automobiles, credit cards, expense accounts and

memberships in social and private organizations and other excessive and unlawful forms of

payment and/or thefts and more than a million dollars in administrative and legal costs in

undoing the wrongs committed by Defendants.

173.    The use of the United States mail, telephone lines, and fax and computer

internet modalities were instrumental in carrying out the pattern of racketeering activity.

174.    The damages and harms complained of herein are a direct result of the

pattern of racketeering activity of the Defendants.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants

Panaccio, Bowers, Flaherty, and various John Does, Jane Does, and Doe Entities  jointly and

severally, for damages as follows:

A.    Compensatory damages in an amount that will make them whole;

B.    Direct, compensatory, and consequential damages, trebled,

pursuant to 18 U.S.C. § 1964;

C.    Pre- and post-judgment interest thereon;

D.    Punitive damages;

E.    Attorney's fees and expenses and costs of suit;

F.    Such other relief that the Court deems appropriate under the

circumstances.

**COUNT II**

**All Plaintiffs v. Panaccio, Bowers, Flaherty,
John Does, Jane Does and Doe Entities**

**Violation of 18 U.S.C. § 1962 (d) (RICO)**

175.    Plaintiffs hereby incorporate all other paragraphs in this Complaint as

though fully set forth herein at length.

176.    As stated previously, the purpose of Defendants Panaccio's, Bower's and

Flaherty's participation in the enterprise was, and still is, the enrichment of the Defendants by

looting  from the NHS entities and inflating NHS' revenues through a series of fraudulent and

criminal acts in order to finance the looting.

177.    The said Defendants agreed to participate in this fraudulent scheme.

178.    The said Defendants conspired to violate 18 U.S.C. § 1962 (c) to

Plaintiffs' detriment.

179.    As a direct result of said conspiracy, Plaintiffs have sustained harm as

stated herein.

180.   The damages and harms complained of herein are a direct result of the pattern of racketeering activity of the Defendants.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants Panaccio, Flaherty and various John Does, Jane Does, and Doe Entities  jointly and severally, for damages as follows:

A.   Compensatory damages in an amount that will make them whole;

B.   Direct, compensatory, and consequential damages, trebled, pursuant to 18 U.S.C. § 1964 (c);

C.   Pre- and post-judgment interest thereon;

D.   Punitive damages;

E.   Attorney's fees and expenses and costs of suit;

F.   Such other relief that the Court deems appropriate under the circumstances.

## COUNT III

### All Plaintiffs v. Panaccio, Bowers, Flaherty, John Does, Jane Does and Doe Entities

### (Fraud)

181.   Plaintiffs hereby incorporate all other paragraphs in this Complaint as though fully set forth herein at length.

182.   In his capacity as President and Chief Executive Officer of NHS -- and various of its affiliates and subsidiaries, including NI -- Panaccio was a fiduciary of NHS, owing it a duty of loyalty and utmost prudence and honesty.

-42-

183.    Flaherty owed NHS a fiduciary duty by virtue of his being a Trustee.

184.    Defendants Panaccio Bowers, and Flaherty made misrepresentations to Plaintiffs and omitted to make material disclosures to Plaintiffs, and detailed at length herein.

185.    The misrepresentations were false when made and Defendants herein knew that they were false when made.

186.    The misrepresentations and omissions include, but are not limited to, the following:

(a)    A failure to disclose that Panaccio was causing an NHS entity to commit Medicare and Medicaid fraud.

(b)    The failure to disclose and/or misrepresentations concerning the full extent of the compensation scheme Defendants herein arranged for themselves as more fully described above.

(c)    The failure to disclose the various fraudulent, noncompetitive transactions made in connection with Amica and United Staffing.

(d)    The failure to disclose the details of the various transactions described more fully above made in connection with the baseball stadium.

(e)    The failure to disclose the siphoning of NHS' funds through Bowers.

187.    The misrepresentations and omissions were material; but for Panaccio's, Bower's and/or Flaherty's expression of them, Plaintiffs would not have undertaken the course of conduct they did.

188.    Panaccio, Bowers, and Flaherty knew the misrepresentations were false when uttered.

-43-

189.    Plaintiffs did not know and could not have known that the misrepresentations were false when made.

190.    Plaintiffs reasonably relied on the misrepresentations or omissions.

191.    Panaccio, Bowers, and Flaherty made the fraudulent misrepresentations egregiously, willfully, purposefully, maliciously and with wanton disregard for Plaintiffs rights.

192.    Additionally, Panaccio, Bowers, and Flaherty employed devices and artifices to defraud Plaintiffs, as more fully described above.

193.    By engaging in the conduct complained of herein, Defendants Panaccio, Bowers and Flaherty breached their duty of loyalty and their various fiduciary duties.

194.    As a direct and proximate result of Defendants' fraud, Plaintiffs sustained harm including as set forth at length above.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants Panaccio, Bowers, Flaherty, various John Does, Jane Does, and Doe Entities  jointly and severally, for damages as follows:

A.    Compensatory damages in an amount that will make them whole;

B.    Pre-and post-judgment interest therein;

C.    Punitive damages; and

D.    Such other relief including attorney's fees and costs that the Court deems appropriate under the circumstances.

## COUNT IV

### All Plaintiffs v. Panaccio, Bowers. Flaherty,
### John Does, Jane Does and Doe Entities

### (Civil Conspiracy)

195.    Plaintiffs hereby incorporate all other paragraphs in this Complaint as though fully set forth herein at length.

196.    For the reasons and by the means set forth at length herein, Defendants combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means.

197.    For the reasons and by the means set forth at length herein, Defendants so acted with intent to injure Plaintiffs and without justification.

198.    For the reasons and by the means set forth at length herein, Defendants Panaccio, Bowers and Flaherty each performed some overt act in pursuance of the common purpose or design and actual damage resulted to each Plaintiff as set forth herein.

199.    Each of the Defendants herein have received monies and/or benefits from NHS wrongfully and as a result of the fraudulent, illegal conduct of various Defendants.

200.    Consequently, Defendants have each been enriched by consequence of their conspiracy in enormous sums of money, to varying degrees, as detailed herein and as further discovery shall disclose.

201.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants Panaccio, Bowers, Flaherty and various John Does, Jane Does, and Doe Entities  jointly and severally, for damages as follows:

      A.      Compensatory damages in an amount that will make them whole;

      B.      Pre- and post-judgment interest therein;

      C.      Punitive damages;

      D.      Such other relief including attorney's fees and costs that the Court deems appropriate under the circumstances.

## COUNT V

### All Plaintiffs v. Panaccio, Flaherty, John Does, Jane Does and Doe Entities

### (Breach of Fiduciary Duty)

202.    Plaintiffs hereby incorporate all other paragraphs in this Complaint as though fully set forth herein at length.

203.    Defendant Panaccio was the President and CEO of Plaintiff NHS.  As such, he owed a fiduciary duty to the Plaintiffs.

204.    Defendant Flaherty owed Plaintiffs a fiduciary duty by virtue of his seat on the Board of Trustees of NHS and the Board of Directors of Enterprises and Amica.

205.    Defendants Panaccio and Flaherty owed Plaintiffs fiduciary duties of loyalty and utmost good faith.  Said Defendants were duty-bound to make full and accurate disclosure of material facts, to abstain from self-dealing at the expense of NHS and to exercise

the skill, care and diligence towards NHS' assets that a reasonably prudent person would exercise in regard to his own property.

206.     Defendants Panaccio and Flaherty breached their duty to Plaintiffs through their conflicts of interests, self-dealing and fraudulent behavior, as detailed above.

207.     As a proximate result of such breaches of duty, Plaintiffs have been damaged as previously alleged.

208.     Defendants' conduct was reckless, willful and wanton, with malice demonstrated a complete want of care and attention to duty and was in conscious disregard of NHS' rights.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants Panaccio, Flaherty, John Does, and Jane Does, jointly and severally, for damages as follows:

A.     Compensatory damages in an amount that will make them whole;

B.     Pre- and post-judgment interest thereon;

C.     Punitive damages;

D.     Such other relief including attorney's fees and cost that the Court deems just and appropriate under the circumstances.

## COUNT VI

### All Plaintiffs v. Bowers

### (Aiding and Abetting Breach of Fiduciary Duty)

209.     Plaintiffs hereby incorporate all other paragraphs in this Complaint as though fully set forth herein at length.

210.     Bowers knew that the officers and directors of NHS, including Panaccio, owed NHS a fiduciary duty and breached said fiduciary duty.

211.     Bowers intentionally provided substantial assistance and encouragement in affecting such breaches of fiduciary duty.

212.     As a direct and proximate result of Bowers' conduct, Plaintiffs were injured.

WHEREFORE, Plaintiffs demand judgment in their favor and against Bowers for damages as follows:

A.     Compensatory damages in an amount that will make them whole;

B.     Pre- and post-judgment interest thereon;

C.     Punitive damages;

D.     Attorney's fees and expenses and costs of suit; and

E.     Such other relief that the Court deems appropriate under the circumstances.

## COUNT VII

### Plaintiffs v. Bowers

### (Negligence)

213.     Plaintiffs hereby incorporate all other paragraphs in this Complaint as though fully set forth herein at length.

214.     Bowers assumed, undertook and owed a duty to Plaintiffs to use reasonable care and competence in rendering them services as an accountant.

215.    Bowers failed to exercise reasonable and ordinary care and competence, including the care and competence of a reasonable accountant in performing the duties owed Plaintiffs.

216.    Specifically, Bowers' negligent acts include, but are not limited to, using NHS funds to pay for personal expenses of Panaccio and others that Bowers knew, or should have known, were personal and not reimbursable business expenses; forwarding NHS funds to Panaccio and others that Bowers knew, or should have known, were neither compensation nor reimbursement for business expenses; failing to disclose to the NHS Board or Compensation Committee and/or NHS' auditors that Panaccio and/or others had directed Bowers to use NHS funds to make illegitimate and unlawful payments or transfers; failing to disclose to the NHS Board or Compensation Committee and/or NHS' auditors that Bowers was making such transfers; and failing to disclose to the NHS Board and/or Compensation Committee and/or NHS' auditors the existence of the secret accounts.

217.    As a direct and proximate result of Bowers' negligence, Plaintiffs have been injured.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Provident Defendants for damages as follows:

A.    Compensatory damages in an amount that will make them whole;

B.    Pre- and post-judgment interest therein;

C.    Punitive damages;

D.    Attorney's fees and expenses and costs of suit; and

E.   Such other relief including attorney's fees and costs that the Court deems appropriate under the circumstances.

## COUNT VIII

## NHS v. Bowers

## (Breach of Contract)

## (Plead in the Alternative)

218.   Plaintiffs hereby incorporate all other paragraphs in this Complaint as though fully set forth herein at length.

219.   In the alternative, Bowers had a contract with NHS to perform the services of a competent and honest accountant, for which he was paid the entirety of the fees he charged.

220.   Bowers breached his contractual responsibilities to NHS for the reasons set forth hereinbefore.

WHEREFORE, Plaintiff NHS demands judgment in its favor and against Bowers for an amount equal to the total of all fees paid to Bowers, together with interest and such other relief as the Court deems just.

## COUNT IX

## All Plaintiffs v. All Defendants

## (Unjust Enrichment)

221.   Plaintiffs hereby incorporate all other paragraphs in this Complaint as though fully set forth herein at length.

222.   Defendants were unjustly enriched and received assets of Plaintiff NHS through their repeated pattern of unlawful acts including fraud and breach of fiduciary duty.

223.    It would be unconscionable for Defendants to retain those monies and benefits.

WHEREFORE, Plaintiffs demand judgment in their favor and against all Defendants, jointly and severally for damages in the following respects:

A.      Compensatory damages in an amount that will make them whole;

B.      Pre- and post-judgment interest thereon;

C.      Attorney's fees and expenses and costs of suit;

D.      Such other relief  including attorney's fees and costs that the Court deems appropriate under the circumstances.

## COUNT X

## All Plaintiffs v. Panaccio

## (Declaratory Relief)

224.    Plaintiffs hereby incorporate all other paragraphs in this Complaint as though fully set forth herein at length.

225.    Various provisions of the Trust Agreement dated April 1, 1994, and indeed regarding the creation and existence of the Trust itself, are the product of the wrongful conduct of Defendants herein, and various acts of conflicts of interest, self-dealing, fraud, and violations of public policy, thus precluding the legal enforceability of said provisions of the Trust and the Trust itself.

226.    The following provisions of the Trust are unenforceable as a matter of law:

"In the event of the resignation or removal of said Successor Trustee, a new trustee shall be appointed by Intrasystems with the consent of the Participants."

"This Trust Agreement may not be amended except by written instrument executed by the Trustee and Intrasystems and consented to by all of the Participants."

227.     Plaintiffs efforts to appoint successor trustees (John M. Todd and Michael A. O'Meara) has have been objected to by various attorneys for various Participants, and has have caused the Provident Defendants to issue a letter (attached hereto as Exhibit "W") stating that it will neither recognize the instructions of the Successor Trustees nor make any further payments to the Participants.

228.     The judicial declaration of the unlawfulness of these provisions, and the Trust itself, will eliminate confusion and conflict which currently exist among the parties to this lawsuit and will end a device by which a fraud upon Plaintiff was and continues to be, perpetuated.

WHEREFORE, Plaintiffs request a full and final declaration from this Honorable Court declaring the April 1, 1994 Trust a legal nullity and that the currently installed Trustees' (each of whom were properly appointed) tenures are now concluded.

## COUNT XI

## All Plaintiffs v. Panaccio

## (Declaratory Relief)

229.     Plaintiffs hereby incorporate all other paragraphs in this Complaint as though fully set forth herein at length.

230.     Various provisions of the Salary Continuation Agreements and Termination and Deferred Compensation Agreements attached hereto as Exhibits "J" through "L" are the product of the wrongful conduct of Defendants herein, and various acts of conflicts of

interest, self-dealing, fraud, and violations of public policy, thus precluding the legal enforceability of said agreements.

231.    The judicial declaration of the unlawfulness of these agreements will eliminate confusion and conflict which currently exist among the parties to this lawsuit and will end devices by which frauds upon Plaintiff had been and continue to be perpetuated.

WHEREFORE Plaintiffs request a full and final declaration from this Honorable Court declaring the Salary Continuation Agreements and Termination and Deferred Compensation Agreements attached hereto as Exhibits "J through "L" a legal nullity.

## COUNT XII

### All Plaintiffs v.  Panaccio

### (Declaratory Relief)

232.    Plaintiffs hereby incorporate all other paragraphs in this Complaint as though fully set forth herein at length.

233.    At or around the time that Defendants Panaccio and  Barr signed the Salary Continuation Agreements attached here as Exhibits "J" and "K" said Defendants also signed Letters of Understanding, copies of which are attached as Exhibit "X."

234.    The Letters of Understanding, which were integral to the formation of the Salary Continuation Agreements, each included the following provisions:

  A.    Adoption and continuation of the Salary Continuation Plan is discretionary at the option of the Compensation Committee.

  B.    The eligibility requirements as well as other terms and conditions of the Plan may be changed from time to

time at the sole discretion of the Compensation Committee.

235.    Plaintiffs interpret these provisions to authorize the Compensation Committee, when within the discretion of the Committee it is appropriate to do so, to nullify the Salary Continuation Plan, releasing Plaintiffs from any obligation to continue making payments to Participants currently receiving benefits under the Plan and from any obligation to begin making payments to the other Participants at some future date.

236.    Plaintiffs have made such determinations.

237.    A judicial declaration that Plaintiffs' interpretation is correct will eliminate the confusion and conflict which currently exist among the parties to this lawsuit and will end devices by which frauds upon Plaintiff have been and continue to be perpetuated.

WHEREFORE, Plaintiffs request a full and final declaration from this Honorable Court that the Letters of Understanding attached hereto as Exhibit "Y" authorize the Compensation Committee, when within the discretion of the Committee it is appropriate to do so, to nullify the Salary Continuation Plan, releasing Plaintiffs from any obligation to continue making payments to Participants currently receiving benefits under the Plan and from any obligation to begin making payments to the other Participants at some future date, and that, having done so, such Salary Continuation Agreements do not obligate Plaintiffs to make available to Defendants any benefits recited therein as of the date of such determinations.

## COUNT XIII

### All Plaintiffs v. All Defendants

### (Constructive Trust)

238.    Plaintiffs hereby incorporate all other paragraphs in this Complaint as though fully set forth herein at length.

239.    Defendants obtained various assets from Plaintiffs through their various acts of fraud, duress, undue influence and/or abuse of a fiduciary relationship, or are knowingly the wrongful beneficiaries of such conduct by other Defendants.

240.    Defendants would be unjustly enriched if they were permitted to retain the proceeds of their wrongdoing as afore stated.

241.    The assets over which Plaintiffs seek the imposition of a Constructive Trust are readily identifiable.

WHEREFORE, Plaintiffs demand judgement in their favor and against all Defendants jointly and severally imposing a constructive trust on the assets received, removed, or looted from NHS by Defendants, with such trust to be for the benefit of the Plaintiffs.

## COUNT XIV

### All Plaintiffs v. All Defendants

### (Restitution)

242.    Plaintiffs hereby incorporate all other paragraphs in this Complaint as though fully set forth herein at length.

243.    Defendants unlawfully made use of Plaintiffs assets and profits.

244.    Defendants were unjustly enriched by the use of Plaintiffs assets.

245.    Defendants have caused financial damage to Plaintiffs, as detailed herein.

WHEREFORE, Plaintiffs demand judgement in their favor and against Defendants and request that this Honorable Court order full restitution to Plaintiffs in this matter from all of the Defendants, jointly and severally.

### COUNT XV

### All Plaintiffs v. All Defendants

### (For an Accounting)

246.    Plaintiffs hereby incorporate all other paragraphs in this Complaint as though fully set forth herein at length.

247.    Each and all of the Defendants herein possess exclusively, or in combination with one or more of each other, documents, information, data, and information which will assist Plaintiffs in computing and proving the full extent of their damages complained of herein.

248.    Each of the Defendants, either directly or by way of association with the other Defendants, enjoyed a special position of trust, confidentiality, and exclusivity with Plaintiffs, and gained an unauthorized access to and possession of its data, documents, and information.

249.    Despite demands, Defendants have refused to turn over all of the data, documents, and information.

WHEREFORE, Plaintiffs demand an Order of the Court for a complete and full accounting of all monies, emoluments, and things of value received from any Northwestern entity by any of the Defendants, together with an Order requiring the return to Plaintiffs of all documents, things, or data possessed by any of the Defendants or their agents and belonging or relating to Plaintiffs.

Respectfully submitted,

**KELLEY& MURPHY**

By:_____
    Joseph T. Kelley, Jr., Esquire
    Attorney of Northwestern
    Human Services, Inc.
    and Northwestern Intrasystems, Inc.
    1628 Pine Street
    Philadelphia, PA 19102
    Phone: (267) 238-1301

Date: October 12, 2004

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**
    GB1066

By:_____
    George Bochetto, Esquire
    Attorney for Plaintiffs, Trustees of
    Northwestern Intrasystems Trust
    dated April 1, 1994
    1524 Locust Street
    Philadelphia, PA 19102
    Phone: (215) 735-3900

Date: October 12, 2004

## <u>CERTIFICATE OF SERVICE</u>

I, George Bochetto, Esquire, hereby certify that today I caused to be served a true and correct

copy of the foregoing Second Amended Complaint upon the following counsel via first-class mail:


Thomas E. Groshens, Esquire
416 South 23rd Street
Philadelphia, PA 19103


Dave Smith, Esquire
SMITH, GIACOMETTI & CHIKOWSKY
100 South Broad Street, Suite 112
Philadelphia, PA 19110


**BOCHETTO & LENTZ, P.C.**
GB1066


By:_____
George Bochetto, Esquire

Date: October 12, 2004